UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NEUROLOGICAL SURGERY PRACTICE OF LONG ISLAND, PLLC,<br><br>         Plaintiff,<br><br> v.<br><br>AETNA LIFE INSURANCE COMPANY; AETNA HEALTH INC.; and AETNA HEALTH INSURANCE COMPANY OF NEW YORK,<br><br>         Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br><br>Case No. |

Plaintiff, Neurological Surgery Practice of Long Island, PLLC; by its attorneys, Harris Beach Murtha Cullina PLLC, alleges for its Complaint against the Defendants, Aetna Life Insurance Company; Aetna Health Inc.; and Aetna Health Insurance Company of New York ("Aetna"), as follows:

**PRELIMINARY STATEMENT**

1. By this lawsuit, Neurological Surgery, a Long Island-based neurological surgery practice seeks to recover over $6.1 million for covered and medically necessary surgical services that Neurological Surgery's clinicians provided to 42 enrollees of health plans sponsored or administered by United on various dates of service.

2. There can be no dispute that Neurological Surgery is entitled to this reimbursement. Each of the 82 claims at issue were the subject of independent dispute resolution (IDR) proceedings under the provisions of the No Surprises Act. In all these proceedings, certified IDR entities issued written determinations that Neurological Surgery was entitled to and

1

awarded Neurological Surgery additional reimbursement. All totaled, this additional reimbursement was more than $6.1 million.

3.      Under the No Surprises Act, Aetna had to pay this additional reimbursement no later than 30 days after the IDR determination date. While the Act gives a losing party limited grounds to challenge an IDR determination, at no point since the subject determinations were issued has Aetna ever raised any of these grounds to challenge any of these terminations. Given that the 30-day deadlines that Aetna had to pay this additional reimbursement have long passed, Neurological Surgery is entitled to this additional reimbursement.

4.      Accordingly, Neurological Surgery brings this lawsuit seeking to confirm these IDR determinations and recover the additional reimbursement it is due, along with interest and all damages it has sustained by reason of Aetna's wrongful refusal to honor its legal obligations.

**PARTIES**

5.      Plaintiff, Neurological Surgery Practice of Long Island, PLLC, is a New York professional service limited liability corporation with its principal place of business located at 100 Merrick Road, Suite 128W, Rockville Centre, New York.

6.      Neurological Surgery Practice of Long Island, PLLC was formed in August 2020 and, because of a merger in December 2020, is the corporate successor of Neurological Surgery, P.C.

7.      Upon information and belief, Defendant Aetna Life Insurance Company is a Connecticut-domiciled insurance company and a wholly owned subsidiary of Aetna Inc. Aetna Life is one of the principal underwriting and administrative entities through which Aetna offers

health insurance coverage and administers health benefit plans. Aetna Life's headquarters and principal place of business are located at 151 Farmington Avenue, Hartford, Connecticut 06156.

8.      Upon information and belief, Defendant Aetna Health Inc. refers collectively to a group of affiliated, state-licensed insurance and health maintenance organization entities that operate under the "Aetna" brand, including entities incorporated or authorized to do business in multiple states. These entities are indirect subsidiaries of Aetna Inc. and function as operating companies issuing policies and administering claims.

9.      Upon information and belief, the New York-domiciled corporation named Aetna Health Inc. maintains its principal place of business at 101 Park Avenue, 15th Floor, New York, New York 10178. Its address on file with the New York Department of State for the service of process is 28 Liberty Street, New York, New York 10005.

10.     Upon information and belief, Defendant Aetna Health Insurance Company of New York is a New York-domiciled insurance company authorized to issue and administer health insurance coverage in the State of New York. Aetna Health Insurance Company of New York is a wholly owned subsidiary of Aetna Inc. and operates as part of the integrated Aetna enterprise. It maintains its principal place of business at 101 Park Avenue, 15th Floor, New York, New York 10178.

11.     Aetna is among the largest health insurance and health plan sponsors in the United States. It provides health insurance coverage and related benefits to tens of millions of members nationwide, and maintains extensive provider networks encompassing hospitals, physicians, and specialty providers throughout the country.

12. Aetna's health insurance operations generate tens of billions of dollars in annual premium revenue, derived from commercial employer-sponsored plans, individual and marketplace coverage, Medicare Advantage and Part D products, and Medicaid managed care programs. As part of CVS Health Corporation's Health Care Benefits segment, Aetna constitutes one of the largest revenue-producing health insurance enterprises in the nation.

13. Aetna is consistently recognized as a top national health insurer by market share, ranking among the largest carriers in commercial insurance, Medicare Advantage enrollment, and state-based Medicaid managed care programs. Through its size and scale, Aetna exercises substantial influence over provider reimbursement rates, coverage determinations, and claims adjudication practices.

14. Aetna offers a broad and integrated portfolio of health insurance and health plan products, including commercial employer-sponsored plans, individual and family plans, Medicare Advantage plans, Medicare Part D prescription drug plans, and Medicaid managed care coverage, as well as related pharmacy, behavioral health, and care management services. These products are administered pursuant to centralized policies and practices that govern utilization management, reimbursement, and claims processing across Aetna's affiliated entities.

## JURISDICTION AND VENUE

15. Jurisdiction of this Court is proper under 28 U.S.C. § 1331, providing for original jurisdiction by federal courts over "a claim or right arising under" the laws of the United States.

16. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for pendent state law claims asserted herein.

4

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the acts complained of have occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

18.     Neurological Surgery is one of the largest private neurosurgery practices on Long Island.

19.     Neurological Surgery's award-winning specialists are among the best neurosurgeons in downstate New York and serve as chiefs of neurosurgery in the most prestigious hospitals on Long Island.

20.     Historically, Neurological Surgery, like other independent medical specialty groups, has not become a participating provider in health plan networks. Notwithstanding this, Neurological Surgery regularly provides medically necessary, covered services on an "out of network" and often emergency basis to enrollees of all health plans, including health plans sponsored or administered by Aetna.

21.     Neurological Surgery's provision of these services since January 1, 2022, in many cases has been governed by the provisions of the No Surprises Act, Public Law No. 116-260.

**Introduction to the No Surprises Act**

22.     In December 2020, the United States Congress enacted the No Surprises Act, which was signed into law as part of the Consolidated Appropriations Act of 2021 (Public Law 116-260; Division BB § 109) on December 27, 2020. It took effect on January 1, 2022.

23.     No Surprises Act § 103 amends 42 U.S.C. §§ 300gg *et seq*. to establish an IDR process for non-emergency services performed by non-participating physicians at in-network

hospitals, hospital outpatient departments, critical access hospitals, and ambulatory surgical centers and out-of-network emergency services in the emergency department of a hospital or independent freestanding emergency department.

24.    The No Surprises Act provides that the federal IDR process will apply and may be used by physicians and health plans to determine the out-of-network rate for emergency services in the emergency department of a hospital or independent freestanding emergency department and non-emergency items and services furnished by non-participating providers during a visit to a participating health care facility when a "specified state law" does not apply (42 U.S.C. § 300gg-111).

25.    Since the No Surprises Act became effective on January 1, 2022, Neurological Surgery's reimbursement for many of these services has been governed by the provisions of the Act.

26.    The No Surprises Act prohibits out-of-network providers, such as Neurological Surgery, from balance billing or otherwise pursuing payments from health plan members. *See* 42 U.S.C. §§ 300gg-131(a) (emergency services), 300gg-132 (non-emergency services performed by nonparticipating providers at participating facilities).

27.    Given this balance billing ban imposed on out-of-network providers, the Act requires health plans, within 30 calendar days after the out-of-network provider transmits its bill to the health plan, to either make an initial payment to the provider or issue a notice of denial of payment. *See id.* §§ 300gg-111(a)(1)(C)(iv) (emergency services), 300gg-111(b)(1)(C) (non-emergency services).

28.     The provider then has 30 days from the day it receives either the initial payment or notice of denial of payment to initiate open negotiations with the health plan for purposes of determining a mutually agreeable amount for the services rendered. This open negotiation period lasts 30 days. *See id.* § 300gg-111(c)(1)(A).

**The Independent Dispute Review (IDR) Process**

29.     If the open negotiations do not result in a mutually agreeable amount for the services rendered, then either party (the provider or the health plan) has four days from the end of the open negotiation period to initiate the independent dispute resolution (IDR) process. *See id.* § 300gg-111(c)(1)(B).

30.     Under the IDR process, an IDR entity is responsible for obtaining offers from both parties as to the appropriate payment for the service, and employing certain criteria to determine one of the party's offers as the appropriate payment for the service. *See id.* § 300gg-111(c)(5).

31.     The IDR process is under the joint oversight of the United States Department of Health and Human Services, the United States Department of Labor, and the United States Department of the Treasury (the "Departments").

32.     The first step in the IDR process is the selection of the IDR entity. Regarding this, the No Surprises Act requires the Departments to "provide for a method . . . that allows . . . [the parties] to jointly select, no later than the last day of the 3-business day period following the date of the initiation of the [IDR] process," a qualifying IDR entity." *See id.* § 300gg-111(c)(4)(F)(i).

33.    The Act goes on to state that "in the case such parties do not make such selection by such last day," the Departments are required to "not later than 6 business days after such date of initiation . . . select such an [IDR] entity." *See id.* § 300gg-111(c)(4)(F)(ii).

34.    As established by the Departments, the party initiating the IDR process with respect to a given claim, typically the provider, makes a certified IDR entity selection when submitting its Notice of Independent Dispute Resolution Initiation Form through the federal IDR portal: https://nsa-idr.cms.gov/paymentdisputes/s/ (accessed Apr. 23, 2026).

35.    As explained in the Departments' *Notice of Independent Dispute Resolution (IDR) Initiation Web Form User Guide*, dated October 2025, at pages 21-22, the portal will not accept an initiating party's IDR initiation and IDR entity selection unless the initiating party electronically checks "Yes" to the following attestation: "*I (We), the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified IDR item(s) and/or service(s) within the scope of the Federal IDR process.*"

36.    A true and correct copy of the Departments' *Notice of Independent Dispute Resolution (IDR) Initiation Web Form User Guide*, dated October 2025, is annexed hereto as **Exhibit A** and incorporated herein by response.

37.    Once the initiating party commences the IDR proceeding, as noted above, the non-initiating party, typically health plans such as the ones that Aetna sponsors or administers, must submit its response to the IDR initiation and proposed certified IDR entity selection through the federal IDR portal.

38.    As explained in the Departments' *Certified Independent Dispute Resolution (IDR) Entity Selection Response Web Form User Guide*, dated July 2025, at pages 16 and 20, the portal will not accept the non-initiating party's response to the initiating party's IDR initiation and proposed certified IDR entity selection response, unless the non-initiating party electronically checks "Yes" to the following attestations: *I agree to: [a] Pay the administrative fee. [b] Pay the IDR entity fee if my dispute is found eligible for the IDR process. [c] Pay the outstanding amount (if any) of the out-of-network rate that is my responsibility as determined by the certified IDR entity. [d] I also understand that the final payment determination made by the certified IDR entity is binding upon the parties and not subject to judicial review except under certain limited circumstances.*

39.    A true and correct copy of the Departments' *Certified Independent Dispute Resolution (IDR) Entity Selection Response Web Form User Guide*, dated July 2025, is annexed hereto as **Exhibit B** and incorporated herein by reference.

40.    No later than ten days after the date the IDR entity is selected, the provider and health plan each must submit to the IDR entity a payment offer with supporting information. *See id.* 300gg-111(c)(5)(B).

41.    No later than 30 days after the date the IDR entity is selected, the IDR entity must, taking into account the considerations set forth in 42 U.S.C. § 300gg-111(c)(5)(C), "select one of the offers submitted . . . to be the amount of payment for such item or service" and notify the provider and health plan of such determination. *Id.* § 300gg-111(c)(5)(A).

**Final and Binding IDR Determinations**

42.     Congress expressly provided that this IDR "payment determination shall be binding on the parties, involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim. . . ." 42 U.S.C. § 300gg-111(c)(5)(E)(i)(I).

43.     Congress further expressly provided that this IDR payment determination "shall not be subject to judicial review, except" on the limited grounds set forth in 9 U.S.C. § 10(a). *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i).

44.     These limited grounds are: (a) where the determination was "precured by corruption, fraud, or undue means," 9 U.S.C. §10(a)(1); (b) where there was "evident partiality or corruption" in the proceedings, *id.* § 10(a)(2); (c) where the IDR entity was "guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced," *id..* § 10(a)(3); or (d) where the IDR entity exceeded its "powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," *id. .* § 10(a)(4).

45.     When the IDR entity has decided the IDR dispute by selecting the provider's offer, the plan has 30 days from the date on which the IDR entity makes its determination to pay the additional reimbursement due the provider. *See* 42 U.S.C. § 300gg-111(c)(6)

46.     Specifically, 42 U.S.C. § 300gg-111(c)(6) provides:

> The total plan or coverage payment required pursuant to subsection (a)(1) or (b)(1), with respect to a qualified IDR item or service for which a determination is made under paragraph (5)(A) or with respect to an item or service for which a payment amount is determined under open negotiations under paragraph (1), shall be made directly to the nonparticipating provider or facility not later than 30 days after the date on which such determination is made.

42 U.S.C. § 300gg-111(c)(6).

**Aetna's Failure to Honor its Obligations**

47.    The spreadsheet annexed hereto as **Exhibit C** and incorporated into this Complaint by reference sets forth claims involving medical services provided by Neurological Surgery to enrollees of Aetna's plans for which (a) an IDR proceeding was commenced; (b) the duly appointed IDR entity, after reviewing the parties' offers and submissions, selected Neurological Surgery's offer, resulting in an additional reimbursement due from Aetna's plans to Neurological Surgery; (c) more than 30 days have elapsed since the IDR entity made these determinations; yet (d) Aetna has failed to pay these additional reimbursement amounts as required by 42 U.S.C. § 300gg-111(c)(6).

48.    Additionally, Aetna's plans have persisted in failing to pay these additional, statutorily ordered reimbursement amounts notwithstanding numerous attempts by Neurological Surgery to have these plans honor their obligation.

49.    The Aetna plans have no legitimate defense to their persistent refusal to pay these additional reimbursement amounts.

50.     In the time that has elapsed since these IDR determinations were made, Aetna's plans have failed to come forward with any objection regarding fraud, misconduct, partiality or corruption, or any IDR entity exceeding its powers.

**Irreparable Injury Sustained By Neurological Surgery**

51.     Aetna's ongoing refusal to pay additional reimbursement has caused significant harm to Neurological Surgery.

52.     The volume of unpaid IDR determinations and awarded reimbursements places an unsustainable financial strain on the practice, jeopardizing its ability to provide quality neurosurgery services in the New York area.

53.     Rising costs and decreasing reimbursement rates further exacerbate the issue. United agreed in IDR proceedings to pay outstanding amounts determined by certified entities but reneged on those commitments.

54.     As a result, Neurological Surgery is left with limited avenues for recovery after following legal procedures.

55.     This is all the more egregious given that, in reliance on Aetna's representations that it would pay the outstanding amount of the out-of-network rate that is its responsibility as determined by the certified IDR entity in each of the IDR proceedings listed in Exhibit C, Neurological Surgery forewent other judicial or administrative avenues that it had to pursue reimbursement for the services that it provided to United's enrollees.

56.     Neurological Surgery should not be penalized for compliance, nor should Aetna benefit from disregarding its obligations.

**FIRST CAUSE OF ACTION**

57.    Neurological Surgery repeats and realleges the allegations set forth above as if more fully set forth herein.

58.    The spreadsheet annexed as Exhibit C, and incorporated into this Complaint by reference, sets forth claims involving medical services provided by Neurological Surgery to enrollees of plans sponsored or administered by Aetna for which  an IDR proceeding under the No Surprises Act was commenced; and the duly appointed certified IDR entity, after reviewing the parties' offers and submissions, issued IDR determinations and awards selecting Neurological Surgery's offer and thereby resulting in an additional reimbursement due from Aetna's plans to Neurological Surgery.

59.    The dates, amounts, and dispute numbers of these IDR determinations and awards are listed on Exhibit C.

60.    For each of the IDR determinations and awards listed on Exhibit C, Aetna has, to date, failed and refused to recognize and honor these IDR determinations and awards by paying the additional reimbursement amounts awarded Neurological Surgery by the IDR determinations and awards within 30 days as required by 42 U.S.C. § 300gg-111(c)(6).

61.    These additional reimbursement amounts awarded Neurological Surgery remain unpaid.

62.    The No Surprises Act specifically provides that IDR determinations awarding additional reimbursement are binding on the parties involved, unless there is a fraudulent claim

or evidence of misrepresentation of facts presented to the IDR entity. 42 U.S.C. § 300gg-111(c)(5)(E)(i).

63.    For each of the IDR determinations and awards listed on Exhibit C, Aetna has failed to come forward with any evidence that the claims at issue were fraudulent or based on a misrepresentation of facts.

64.    Further, Aetna has failed to come forward with any argument or evidence that the award was procured by corruption, fraud, or undue means; there was evident partiality or corruption in the IDR entity, or either of them;  the IDR entity was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or the IDR entity exceeded its powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. *See* 9 U.S.C. § 9(a).

65.    By reason of all the foregoing, Neurological Surgery is entitled to a judgment confirming each and every one of the IDR determinations and awards listed on Exhibit C, in accordance with the provisions of the No Surprises Act, 42 U.S.C. § 300gg-111(c)(6), and the decision of the District Court in *Agag v. Cigna Health & Life Ins. Co.*, No. 3:25-cv-00498 (SRU), 2026 WL 1021213 (D. Conn. Apr. 15, 2026), a copy of which is annexed to this Complaint as **Exhibit D** and incorporated herein by reference.

## SECOND CAUSE OF ACTION

66.    Neurological Surgery repeats and realleges the allegations set forth above as if more fully set forth herein.

14

67.     Neurological Surgery initiated all the IDR proceedings listed on Exhibit C.

68.     In doing so, Neurological Surgery agreed to submit itself to the jurisdiction and decision-making authority of the certified IDR entity selected to hear and determine the proceeding, and to be bound by the entity's determination in accordance with the provisions of the No Surprises Act.

69.     Neurological Surgery also represented to the Departments and Aetna and agreed in each of the IDR proceedings listed on Exhibit C "that the item(s) and/or service(s) at issue are qualified IDR item(s) and/or service(s) within the scope of the Federal IDR process."

70.     In response, in each of the IDR proceedings listed on Exhibit C, Aetna represented to the Departments and Neurological Surgery that it "understand[s] that the final payment determination made by the certified IDR entity is binding upon the parties and not subject to judicial review except under certain limited circumstances" set forth in the No Surprises Act."

71.     At the same time, Aetna agreed, in each of the IDR proceedings listed on Exhibit C, to "Pay the outstanding amount (if any) of the out-of-network rate that is my responsibility as determined by the certified IDR entity."

72.     By reason of these mutual agreements and representations, enforceable agreements were created between Neurological Surgery and Aetna under which, among other things, they agreed (a) to submit each of the disputes underlying the IDR determinations listed on Exhibit C to the jurisdiction and decision-making authority of the selected certified IDR entity; (b) that the final payment determination made by the certified IDR entity is binding upon the

parties and not subject to judicial review except under certain limited circumstances set forth in the No Surprises Act; and (c) to pay the outstanding amount, if any, of the out-of-network rate that is the party's responsibility as determined by the certified IDR entity.

73.    Neurological Surgery fully fulfilled its obligations under the parties' agreements.

74.    Aetna materially breached the parties' agreements by, among other things, failing to pay the outstanding amount of the out-of-network rate that is its responsibility as determined by the applicable certified IDR entity in each of the IDR determinations and awards listed in Exhibit C.

75.    Aetna's breaches were material and went to the essence of the parties' agreements.

76.    As a direct and proximate result of Aetna's breaches, Neurological Surgery has sustained damages in an amount to be proven at trial but not less than $6,181,777.63.

## THIRD CAUSE OF ACTION

77.    Neurological Surgery repeats and realleges the allegations set forth above as if more fully set forth herein.

78.    Neurological Surgery initiated all the IDR proceedings listed on Exhibit C.

79.    In doing so, Neurological Surgery agreed to submit itself to the jurisdiction and decision-making authority of the certified IDR entity selected to hear and determine the proceeding, and to be bound by the entity's determination in accordance with the provisions of the No Surprises Act.

80.    Neurological Surgery also represented to the Departments and Aetna and agreed in each of the IDR proceedings listed on Exhibit C ""that the item(s) and/or service(s) at issue are qualified IDR item(s) and/or service(s) within the scope of the Federal IDR process."

81.    In response, in each of the IDR proceedings listed on Exhibit C, Aetna represented to the Departments and Neurological Surgery that it "understand[s] that the final payment determination made by the certified IDR entity is binding upon the parties and not subject to judicial review except under certain limited circumstances" set forth in the No Surprises Act."

82.    At the same time, United agreed, in each of the IDR proceedings listed on Exhibit C, to "Pay the outstanding amount (if any) of the out-of-network rate that is my responsibility as determined by the certified IDR entity."

83.    By reason of these mutual agreements and representations, enforceable agreements were created between Neurological Surgery and Aetna under which, among other things, they agreed (a) to submit each of the disputes underlying the IDR determinations listed on Exhibit C to the jurisdiction and decision-making authority of the selected certified IDR entity; (b) that the final payment determination made by the certified IDR entity is binding upon the parties and not subject to judicial review except under certain limited circumstances set forth in the No Surprises Act; and (c) to pay the outstanding amount, if any, of the out-of-network rate that is the party's responsibility as determined by the certified IDR entity.

84.    Neurological Surgery fully fulfilled its obligations under the parties' agreements.

85.     Aetna materially breached the parties' agreements by, among other things, failing to pay the outstanding amount of the out-of-network rate that is its responsibility as determined by the applicable certified IDR entity in each of the IDR determinations and awards listed in Exhibit C.

86.     Aetna's breaches were material and went to the essence of the parties' agreements.

87.     Aetna remains capable of performing its contractual obligations under the agreements.

88.     Neurological Surgery's contractual rights under the agreements cannot be adequately protected or compensated through an award of money damages.

89.     As a result, Neurological Surgery has no adequate remedy at law.

90.     Neurological Surgery has acted in good faith and with clean hands in all respects relevant to the agreements.

91.     The balance of equities favors enforcement of the agreements according to their terms.

92.     Absent an order directing specific performance, Neurological Surgery will suffer irreparable harm for which there is no adequate remedy at law.

93.     Based on all the foregoing, Neurological Surgery is entitled to a judgment directing Aetna to specifically perform its obligations under the agreements, including but not limited to complying with its obligations under the IDR determinations and awards listed on

18

Exhibit C; enjoining Aetna from taking any action inconsistent with such performance; and awarding Neurological Surgery costs, disbursements, and interest as permitted by law.

**FOURTH CAUSE OF ACTION**

94. Neurological Surgery repeats and realleges the allegations set forth above as if more fully set forth herein.

95. Neurological Surgery initiated all the IDR proceedings listed on Exhibit C.

96. In doing so, Neurological Surgery agreed to submit itself to the jurisdiction and decision-making authority of the certified IDR entity selected to hear and determine the proceeding, and to be bound by the entity's determination in accordance with the provisions of the No Surprises Act.

97. Neurological Surgery also represented to the Departments and Aetna and agreed in each of the IDR proceedings listed on Exhibit C "that the item(s) and/or service(s) at issue are qualified IDR item(s) and/or service(s) within the scope of the Federal IDR process."

98. In response, in each of the IDR proceedings listed on Exhibit C, Aetna represented to the Departments and Neurological Surgery that it "understand[s] that the final payment determination made by the certified IDR entity is binding upon the parties and not subject to judicial review except under certain limited circumstances" set forth in the No Surprises Act."

99.     At the same time, Aetna agreed, in each of the IDR proceedings listed on Exhibit C, to "Pay the outstanding amount (if any) of the out-of-network rate that is my responsibility as determined by the certified IDR entity."

100.    By reason of these mutual agreements and representations, Neurological Surgery alleges that enforceable agreements were created between Neurological Surgery and Aetna under which, among other things, they agreed (a) to submit each of the disputes underlying the IDR determinations listed on Exhibit C to the jurisdiction and decision-making authority of the selected certified IDR entity; (b) that the final payment determination made by the certified IDR entity is binding upon the parties and not subject to judicial review except under certain limited circumstances set forth in the No Surprises Act; and (c) to pay the outstanding amount, if any, of the out-of-network rate that is the party's responsibility as determined by the certified IDR entity.

101.    In the event that this Court finds that these agreements are unenforceable in whole or in part, nevertheless Aetna made clear and unambiguous promises to Neurological Surgery that Aetna would pay the outstanding amount, if any, of the out-of-network rate that is the party's responsibility as determined by the certified IDR entity in each of the IDR proceedings listed in Exhibit C to the Complaint.

102.    Aetna intended, and reasonably should expected, that Neurological Surgery would rely on those promises.

103.    Neurological Surgery reasonably and foreseeably relied on Aetna's promises by, among other things, proceeding to participate in the voluntary IDR proceedings, and foregoing other avenues available at law, administratively, or in equity to recover proper reimbursement for

the services that Neurological Surgery rendered that are the subject of the IDR proceedings listed on Exhibit C to the Complaint.

104.    Neurological Surgery's reliance was reasonable under the circumstances.

105.    Aetna failed to honor its promises.

106.    As a result of its reliance on Aetna's promises, Neurological Surgery suffered substantial injury, including but not limited to monetary losses; expenditures incurred; and lost opportunities.

107.    Enforcement of Aetna's promises is necessary to avoid injustice.

108.    By reason of the foregoing, Neurological Surgery is entitled to judgment against Neurological Surgery for damages sufficient to compensate Aetna for its reliance losses; interest as permitted by law; and costs and disbursements.

## FIFTH CAUSE OF ACTION

109.    Neurological Surgery repeats and realleges the allegations set forth above as if more fully set forth herein.

110.    By reason of all the foregoing, Neurological Surgery, by operation of law, had a legal possessory right or interest in the additional reimbursement awarded Neurological Surgery in connection with each of the IDR determinations set forth on Exhibit C upon the 31st day after the IDR determination was issued.

111.    By reason of all the foregoing, the additional reimbursement awarded Neurological Surgery on each of the IDR determinations set forth on Exhibit C separately constituted a specifically identifiable fund relating to each separate IDR determination.

112.    From the 31st day after each of the IDR determinations set forth on Exhibit C was issued through today, Aetna has exercised dominion over the separately identifiable fund of additional reimbursement to the exclusion of Neurological Surgery's possessory right or interest.

113.    From the 31st day after each of the IDR determinations set forth on Exhibit C was issued through today, Aetna has interfered with this separately identifiable fund of additional reimbursement to the derogation of Neurological Surgery's possessory right or interest.

114.    By reason of all the foregoing, Neurological Surgery was damaged in amount to be determined at trial.

115.    Neurological Surgery's compensatory damages include the value of each of the separately identifiable funds for additional reimbursement. The total combined value of these funds currently is no less than $6,181,777.63.

116.    Neurological Surgery's compensatory damages include interest on the value of each of the separately identifiable funds of additional reimbursement, calculated at the statutory rate running from the date that Aetna first exercised dominion over each separately identifiable fund of additional reimbursement to the exclusion of Neurological Surgery's possessory right or interest, and ending on the date that United turns over these to Neurological Surgery

117.    Neurological Surgery's compensatory damages also include the costs it incurred in attempting to obtain possession of the funds converted by Aetna.

## SIXTH CAUSE OF ACTION

118.    Neurological Surgery repeats and realleges the allegations set forth above as if more fully set forth herein.

119.    This cause of action is plead in the alternative and only applies if the Court finds that there is no enforceable contract at law between the parties governing the subject matter of this action.

120.    Starting on the 31st day after each of the IDR determinations set forth on Exhibit C was issued, Aetna received and has retained the additional reimbursement awarded Neurological Surgery by the IDR determinations.

121.    As of the 31st day after each of the IDR determinations set forth on Exhibit C was issued, the additional reimbursement awarded Neurological Surgery by the IDR determines belonged to Neurological by operation of law.

122.    Starting on the 31st day after each of the IDR determinations set forth on Exhibit C was issued, United benefitted from the receipt and retention of this money, by, among other things, generating interest on this money and otherwise having use of this money for investment or payment of expenses.

123.    By reason of all the foregoing, under principles of equity and good conscience, United should not be permitted to keep this money.

124.    By reason of all the foregoing, Neurological Surgery has been damaged in an amount to be determined trial, but in any event no less than $6,181,777.63, together with statutory interest, and the costs and disbursements of this action.

23

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff, Neurological Surgery Practice of Long Island, PLLC, demands judgment against the Defendants, Aetna Life Insurance Company; Aetna Health Inc.; and Aetna Health Insurance Company of New York, as follows:

a.    On the first cause of action, confirming each and every one of the IDR determinations and awards listed on Exhibit C, in accordance with the provisions of the No Surprises Act, 42 U.S.C. § 300gg-111(c)(6), and the decision of the District Court in *Agag v. Cigna Health & Life Ins. Co.*, No. 3:25-cv-00498 (SRU), 2026 WL 1021213 (D. Conn. Apr. 15, 2026).

b.    On the second cause of action, awarding Neurological Surgery compensatory damages in an amount to be proven at trial but not less than $6,181,777.63, together with costs, disbursements, and interest as permitted by law.

c.    On the third cause of action, directing Aetna to specifically perform its obligations under the agreements, including but not limited to complying with its obligations under the IDR determinations and awards listed on Exhibit C; enjoining Aetna from taking any action inconsistent with such performance; and awarding Neurological Surgery costs, disbursements, and interest as permitted by law.

d.    On the fourth cause of action, awarding damages sufficient to compensate Neurological Surgery for its reliance losses; interest as permitted by law; and costs and disbursements.

e.      On the fifth cause of action, awarding Neurological Surgery compensatory damages in an amount to be determined at trial including, but not limited to, the combined value of each of the separately identifiable funds for additional reimbursement, together with costs, disbursements, and interest as permitted by law.

f.      On the sixth cause of action, awarding Neurological Surgery compensatory damages in an amount to be determined trial, but in any event no less than $6,181,777.63, together with costs, disbursements, and interest as permitted by law.

g.      Awarding Plaintiff such other and further relief that the Court deems proper.

Dated: April 30, 2026
       Uniondale, New York

HARRIS BEACH MURTHA CULLINA,
PLLC.
*Attorneys for Plaintiff*

By  _____
            Roy W. Breitenbach

333 Earle Ovington Boulevard, Suite 901
Uniondale, New York 11553
(516) 880-8378
rbreitenbach@harrisbeachmurtha.com

25

TO:    AETNA LIFE INSURANCE COMPANY
       151 Farmington Avenue
       Hartford, Connecticut 06156.

       AETNA HEALTH INC.
       101 Park Avenue, 15th Floor
       New York, New York 10178

       AETNA HEALTH INSURANCE COMPANY OF NEW YORK
        101 Park Avenue, 15th Floor,
       New York, New York 10178.